# In the United States Court of Federal Claims

No. 17-889C
(Filed Under Seal: May 12, 2020)
(Reissued For Publication: May 21, 2020)[1]

*******************************************
|   |   |
|---|---|
| **IDEAL INNOVATIONS, INC.,** | * |
| **THE RIGHT PROBLEM, LLC, and,** | * |
| **ROBERT KOCHER,** | * Motion to Dismiss, Summary Judgment, |
|   | *Questions of Fact, Actual Reduction to |
| Plaintiffs, | *Practice |
|   | * |
| v. | * |
|   | * |
| **THE UNITED STATES,** | * |
|   | * |
| Defendant | * |
|   | * |
|   | * |
| **OSHKOSH CORPORATION, GENERAL** | * |
| **DYNAMICS LAND SYSTEMS, INC., FORCE** | * |
| **PROTECTION, INC., and GENERAL** | * |
| **DYNAMICS LAND SYSTEMS – FORCE** | * |
| **PROTECTION, INC.,** | * |
|   | * |
| Third Party Defendants. | * |
|   | * |

*******************************************

## Opinion and Order

**DAMICH,** Senior Judge

Ideal Innovations, Inc. (I3), The Right Problem, Inc., and Robert Kocher (hereinafter "Plaintiffs") sued the United States ("the Government) on June 29, 2017 for infringement of United States Patent Nos. 8,651,008 ("the '008 patent"), 7,401,540,[2] and 8,365,648 ("the '648 patent"), which relate to a configuration of armor on a vehicle. Mr. Kocher is the inventor. Oshkosh Corporation ("Oshkosh"), and General Dynamics Land Systems, Inc., Force Protection,

---

[1] The parties were to submit redactions by May 19, 2020. No redactions were forthcoming.

[2] The case for patent infringement of the '540 patent was dismissed as beyond the statute of limitations. *See Ideal Innovations, Inc. v. United States*, No. 17-889C, ECF No. 40 (May 31, 2018).

Inc., and General Dynamics Land Systems – Force Protection, Inc. (collectively, "General Dynamics") were added as Third-Party Defendants on April 3, 2019. The United States and the Third-Party Defendants are collectively referred to as "Defendants" in this Opinion and Order.

On June 29, 2017, Plaintiffs' filed a Complaint alleging three patent infringement claims and three trade secret claims. In lieu of an answer, the Government filed a Motion to Dismiss the patent infringement and trade secret claims as time-barred. Separately, and in the alternative, the Government sought dismissal for failure to state a claim that Plaintiffs' failed to protect the secrecy of their trade secrets. On May 31, 2018, the Court issued an Opinion denying-in-part and granting-in-part the Government's Motion to Dismiss with regard to the patent claims. Specifically, the Court dismissed as time-barred Count I of Plaintiffs' Complaint, the patent infringement of the '540 patent, and denied the Government's Motion to Dismiss as to Count II and III, the patent infringement of the '648 and '008 patents. The Court held in abeyance its ruling on the Government's Motion to Dismiss with regard to the trade secret claims. On September 24, 2018, the Court granted the Government's Motion to Dismiss the trade secret claims as time-barred.

On October 5, 2018, Defendants filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). On March 4, 2019, the Court issued an Opinion denying Defendants' 12(b)(6) motion. On April 3, 2019, pursuant to RCFC 14(c) and the Court's Notice pursuant to Rule 14(b), ECF No. 20, Oshkosh and General Dynamics each filed an answer to the Plaintiffs' Complaint. On the same day, the Government also filed an answer.

On July 3, 2019, Defendants filed a Motion to Dismiss for Lack of Jurisdiction, or, in the Alternative, for Summary Judgment, ECF No. 72, with respect to the remaining claims, the patent infringement claims as to the '008 and '648 patents. On July 31, 2019, Plaintiffs filed a response. ECF No. 72. On August 14, 2019, Defendants filed a reply. ECF No. 81.

Defendants' Motion to Dismiss for Lack of Jurisdiction, or, in the Alternative, for Summary Judgment, filed on July 3, 2019, is the subject of this Opinion and Order. It asks the Court "one, simple question": "Does the United States have a license to manufacture and use Plaintiffs' invention because it was first actually reduced to practice in the performance of Plaintiffs' agreement with ARL [Army Research Laboratory] or the Ballistic Protection Experiment?" ECF No. 72 at 2.

The Plaintiffs and the U.S. Army ("Army") worked on an armored vehicle which would defeat explosively formed penetrators (EFPs). During this work, Plaintiffs and the Government entered into two agreements. The first was entered into on August 28, 2006 and is referred to in this Opinion and Order as the Rapid Equipping Force (REF) Contract. The second was a Cooperative Research and Development Agreement (CRADA), which, according to the parties' March 13, 2020 Stipulation, became effective no later than February 20, 2007. The CRADA included provisions that granted a license to the Army on any invention first actually reduced to practice during the term of the CRADA. The REF Contract did not include any provisions regarding a license for the Government. Defendants assert that the invention was first actually reduced to practice during the CRADA and that, if the invention was first actually reduced to

practice during the REF Contract, the Army has a license to use it because of the Bayh-Dole Act and certain provisions of the Federal Acquisition Regulations ("FAR") which are incorporated into the REF Contract by operation of law through the *Christian* doctrine.[3]

Because there is a genuine issue of material fact regarding when the invention was first actually reduced to practice, the Court **DENIES** the Motion.

## I.     Actual Reduction to Practice

"Actual reduction to practice is when the invention 'is put into physical form and shown to be operative in the environment of its practical contemplated use.'"  *Pilley v. United States*, 74 Fed. Cl. 489, 497 (2006) (quoting *Tech. Dev. Corp. v. United States*, 597 F.2d 733, 746–47 (Ct. Cl. 1979)).  The elements of actual reduction to practice are: (1) construction of an embodiment that meets all limitations and (2) a determination that the invention would work for its intended purpose. This determination is often made through testing.  *See McDonnell Douglas Corp. v. United States*, 670 F. 2d 156, 161, 163 (Ct. Cl. 1982); *see also Slip Track Sys., Inc. v. Metal-Lite, Inc.,* 304 F.3d 1256, 1267 (Fed. Cir. 2002).

### A.  What is the Invention?

In this case, the invention is a Highly Survivable Urban Utility Vehicle (HSUUV) described in patents '008 and '648. "[T]he Patents-in-Suit are directed to the location and configuration of armor on a vehicle."  ECF No. 77 at 28. The patents do not describe just a "configuration of armor."

An examination of the claims of the patents in suit indicates that a "wheeled vehicle" is an integral part of the invention. The independent claims of both patents use the phrase, "wheeled armored vehicle system." '008: claims 1, 3; '648: claims 1, 10. The '008 patent uses "wheeled armored vehicle" consistently in all dependent claims. The '648 patent uses "wheeled armored vehicle system" in dependent claim 2, 7, 11, and 12.  Otherwise, only "wheeled armor vehicle" is used. The independent claims of both patents say that the "wheeled armored vehicle system comprises": (1) a wheeled vehicle, (2) heavy armor on certain areas of the vehicle, and (3) light armor on certain other areas of the vehicle.

Turning to the specification, the Court notes that The Abstract of both patents says that the HSUUV "provides a novel way to balance the concerns of armor, mobility and cost."  The use of "mobility" as well as "armor" sheds light on the inclusion of the limitation of a vehicle in the claims mentioned above. Furthermore, the Brief Summary of the Invention states:  "One major advantage of the [HSUUV] is the speed and mobility of the vehicle." '008, 1:61-62; '648, 1:61-62.

---

[3] The parties have stipulated that Mr. Kocher conceived of the invention before the effective dates of these agreements. *See* Joint Stipulation regarding Mini-Trial Facts and Motion for an Order Staying Discovery, ECF No. 109.

Since the invention describes a vehicle with a certain configuration of armor, putting this invention into "physical form," for purposes of actual reduction to practice, must include a vehicle with the configuration of armor described in the patents. Thus, in analyzing the submissions in this case for actual reduction to practice, the Court will look first for references to an armored vehicle in physical form.

### B. Physical Form of the Invention

There are three important events to be examined in determining when the invention was put in physical form: (1) armor testing in March 2006, (2) the date of the REF Contract, and (3) the date of the CRADA.

#### 1. Armor Testing

On March 10, 2006, armor for the vehicle was tested. There is no evidence that the armor was tested as attached to a vehicle using the patented configuration. Therefore, the date of this test cannot be an actual reduction to practice of an armored vehicle, which is the patented invention.

Plaintiffs argue, however, that "[s]omething less than a full embodiment can meet the first element of the actual reduction to practice test." ECF No. 77 at 19. According to Plaintiffs, this principle transforms the March 10, 2006 armor test into an actual reduction to practice, because "once the armor was proven effective in March 2006, the invention was fully reduced to practice as the simple calculation of the armor weight in combination with the rest of a commercially-available vehicle was sufficient to show the invention was fit for its intended purpose." ECF No. at 31. First, the cases that Plaintiffs cite for the principle do not apply in the circumstances of this case. The cases cited by Plaintiffs involve computer simulations in areas of science where they would be appropriate proof of actual reduction to practice, e.g. a lunar landing. Second, as the Court has found, actual reduction to practice given the circumstances of this case requires a physical embodiment of an armored *vehicle*.

#### 2. REF Contract

The next date relevant to actual reduction to practice of an armored vehicle is August 28, 2006. This is the effective date of a contract between the Army and I3, regarding the Rapid Equipping Force's Ballistic Protection Experiment, referred to as the "REF contract" or "BPE contract."[4] This contract called for I3 to deliver to the Army Research Laboratory (ARL) two *chassis* for the BPE. ECF No. 72 at DA 229.[5] The use of the word, "chassis," suggests to the Court that an armored vehicle was not required to be delivered. But, as the Plaintiffs point out, the Technical Statement of Work of the REF Contract, states: "The contractor will provide the technical and manufacturing capability to furnish the [REF] with two (2) prototype *armored vehicles* based on a commercial domestic truck chassis." ECF No. 72 at DA 227 (emphasis added). This sentence, however, is directed toward Plaintiffs providing "technical and

---

[4] Contract no. W9124Q-06-P-0491.
[5] "DA __" refers to Defendant's appendix.

manufacturing capability" to "furnish" REF with two armored vehicles. Thus, this sentence may mean chassis were to be delivered to REF and that Plaintiffs were to provide their expertise so that the result under the contract would be the production of the armored vehicles that REF wanted. REF would be "furnished" with the armored vehicles by means of collaborative work under the contract. Therefore, it is possible to conclude from the language of the REF Contract that the physical embodiment of the invention would not be finalized until after the delivery date of the chassis, which is February 26, 2007.

### 3. CRADA

The next relevant date is the effective date of the Cooperative Research and Development Agreement ("CRADA"), which the parties have stipulated as being not later than February 20, 2007. This is the only written agreement that expressly provided for a license for the Government if the invention was first actually reduced to practice while it was effective.

This language of the CRADA supports the conclusion that the invention was not actually reduced to practice prior to the effective date of the CRADA. Article 2, Objectives, states that the program goal is to integrate armor onto a vehicle being developed by I3. This suggests that at the effective date of the CRADA there was no "armored" vehicle in physical form. Indeed, Article 2 mentions two tasks: (1) designing the armor and (2) integrating the armor design onto a vehicle.

> The program goal is to integrate ARL-designed armor(s) onto a vehicle being developed by Ideal Innovations Inc. Ideal Innovations Inc. and ARL will mutually develop design constraints and choose the best available armor technology based on ARL data. ARL will perform limited optimization of the design through computer simulations. The final design will be tested by ARL to gain confidence in its performance. Ideal Innovations Inc. will integrate this design onto a vehicle platform. Ideal Innovations Inc. and ARL will work together to overcome armor integration issues if and when they arise.

ECF No. at DA 124.

CRADA Appendix A, Statement of Work (SOW), restates the objectives set forth under Article 2 of the CRADA and sets forth specific work tasks for ARL and I3 to perform to achieve the CRADA objectives. The SOW assigns the task of selecting the armor to ARL and to I3 the task of putting the armor on a vehicle (assuming that the "[a] full size armor Module" is an armored vehicle):

> ARL and I3 will define system constraints and down select armor technologies to investigate.
>
> ARL will perform model simulations of down selected technology to help refine a design for test. Results of the simulation will be furnished to Ideal Innovations Inc.

> ARL will fabricate and test two coupons of either an existing design or a refined design by shooting them with the worst case threat munition available for test. Test results and design shot will be furnished to Ideal Innovations Inc.
>
> The best (lightest weight/smallest volume) successful design which would be either the current design or the "refined" design, ARL will build and shoot up to six (6) coupons. The threat will be the worst case threat munition available for test. Results of the testing will be furnished to Ideal Innovations Inc.
>
> A full size armor Module will be furnished at a later date by I3 for testing against the worst case threat munition available for test. The results of the test will be furnished to Ideal Innovations Inc.
>
> ARL may potentially perform system level survivability modeling to determine benefit of armor packages to crew survivability. Ideal Innovations Inc. would supply ARL information on vehicle geometry and crew location.

*Id*. at 144.

### 4. Disputed Facts

After the effective date of the CRADA, there are photos of the first BPE vehicle. The photos show an armored vehicle but the Court does not know when the photos were taken. The delivery of the BPE vehicles was scheduled for February 26, 2007, and it appears that they were in fact delivered on that date and accepted by the Government. If these BPE vehicles are the armored vehicles described in the patents, then the first physical embodiment of the invention occurred after the effective date of the CRADA. Plaintiffs specific assertions in this regard are discussed below.

Furthermore, the parties agree that there was a test fire in March 2007. Defendants aver that "starting on March 9, 2007, the Army tested the Bull prototypes."[6]  ECF No. 72 at 11. Plaintiffs state that they "do not dispute that the March 2007 test fire occurred and was successful." ECF No. 77 at 33.  Therefore, the Court can find that the invention was in physical form in March 2007 (and was determined to work for its intended purpose because of the test fire). Plaintiffs, however, point out that just because this event is evidence of an actual reduction to practice, it does not prove that it was the *first* actual reduction to practice. *See id*. at 34.

Plaintiffs assert that the first actual reduction to practice occurred before February 10, 2007, which is before the effective date of the CRADA. Specifically, Plaintiffs assert:

> Defendants cannot dispute that a fully operational, painted, tested, and delivered BULL was shown no later than February 22, 2007.  Also, Mr. Kocher has explained that the BULL was fully assembled with armor integrated with a chassis before

---

[6] The "BULL" is the name given by Mr. Kocher to the armored vehicle described in the patents. It was originally called "Focused Armored Vehicle" (FAV).

>February 10, 2007. Additional pictures incorporated into earlier presentations show a fully assembled vehicle earlier than February 10, 2007. Discovery will show these pictures evidence a fully assembled vehicle as claimed in the Patents-in-Suit before February 10, 2007, in the form of photographs and travel records. Indeed, Mr. Kocher worked with a third-party, Ceradyne, Inc., to manufacture the first completed BULL before February 10, 2007.

ECF No. 77 at 15 (citations omitted).

But there are problems with these assertions.

First, the assertion that "Defendants cannot dispute that a fully operational, painted, tested, and delivered BULL was shown no later than February 22, 2007" is without support. Why can the Defendants not dispute this allegation? The Court is not told. True, Defendants admit that "Plaintiffs circulated pictures of the first completed Bull prototype just before [the February 26th] meeting. ECF No. 72 at DA 150- 153 (Ex. 112, Feb. 23, 2007 email and attachments)." The photos at DA 150-153 are part of an email that identifies the photos as being the BULL, and the date of this email is February 22, 2007. But this is two days after the effective date of the CRADA, which is February 20, 2007. Although the date of the photos is not given, it is likely that it would be before February 20, 2007, unless the BULL can be assembled in two days, but this is an inference, not proof. From the photos, the BULL appears to be "painted," but they do not prove that it is "fully operational." The email states that it will be—not has been—"delivered" on "Monday," which would be February 26, 2007, because February 23 is identified as a Friday. Finally, the photos do not prove that the BULL has been "tested."

Second, although the Court has no reason to doubt Mr. Kocher's veracity, his statements are susceptible to the charge that they are self-serving.

Third, the additional photos at DA 165-71 do not "show a fully assembled vehicle earlier than February 10, 2007." They show an armored vehicle in various stages of construction, and the Court cannot discern any date on the photos. Perhaps this is why, immediately following this assertion, Plaintiffs feel that they must have recourse to discovery to prove it.

Fourth, although the Court does not doubt that Mr. Kocher worked with Ceradyne, Plaintiffs provide no support for the assertion that the "first completed BULL [was manufactured] before February 10, 2007." The Court assumes that Mr. Kocher's declaration supports this statement, where it states: "we had the vehicles assembled with armor configured on the cab by about February 1, 2007."

Finally, the Court is puzzled why simple proof of the manufacture of the BULL before February 20, 2007 eludes Plaintiffs (such that discovery is necessary). Didn't Mr. Kocher and I3 design and manufacture it?

### C. Works For Its Intended Purpose

In addition to a physical embodiment, actual reduction to practice requires that it be shown to work for its intended purpose. As noted above, the parties agree that the patented vehicle was tested in March 2007, and it was successful. This is evidence of actual reduction to practice. Although Plaintiffs state that the BULL was tested before February 22, 2007, the Court can find no other evidence of successful testing of the patented armored vehicle (as opposed to just the armor) other than the March 2007 test. It is not enough that Plaintiff, I3, may have constructed the patented vehicle before the effective date of the CRADA, it must have also been shown to be fit for its intended purpose before then.

Perhaps Plaintiffs' basis for their assertion that the armored vehicle was tested "no later than February 22, 2007," is that the fully assembled armored vehicle alone was sufficient to demonstrate that it worked for its intended purpose. ECF No. 77 at 21. The authority cited by Plaintiffs for this proposition is *Scott v. Finney* where the Federal Circuit held "that '[s]ome devices are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate workability." *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994). But this statement can be traced back to an 1898 decision of the Court of Appeals of the District of Columbia in *Mason v. Hepburn*. Here is the context of the quotation:

> It is settled beyond all question, that a drawing of even the simplest machine or device, perfect in every detail, and plainly demonstrating the principle, efficacy, and practical utility of the invention, will not constitute reduction to practice. Nor will the requirements of reduction to practice or use be satisfied by a construction clearly designed and intended as a model and nothing more. They are but evidences of conception, furnishing the foundation of an award of priority when accompanied by proof of subsequent diligence in the matter of actual reduction to practice. At the same time some devices are so simple, and their purpose and efficacy so obvious, that the complete construction of one of a size and form intended for and capable of practical use might well be regarded as a sufficient reduction to practice, without actual use or test in an effort to demonstrate their complete success or probable commercial value.

13 App.D.C. 86, 89. The device was a clip for a gun magazine—a far cry from the armored vehicle described in the patents.

In this matter, the Court is guided by the Federal Circuit's discussion in *Scott v. Finney*:

> All cases deciding the sufficiency of testing to show reduction to practice share a common theme. In each case, the court examined the record to discern whether the testing in fact demonstrated a solution to the problem intended to be solved by the invention. In tests showing the invention's solution of a problem, the courts have not required commercial perfection nor absolute replication of the circumstances of the invention's ultimate use. Rather, they have instead adopted a common sense assessment. This common sense approach prescribes more scrupulous testing under circumstances approaching actual use conditions when the problem includes many

uncertainties. On the other hand, when the problem to be solved does not present myriad variables, common sense similarly permits little or no testing to show the soundness of the principles of operation of the invention.

34 F.3d 1058, 1063 (Fed. Cir. 1994).

Both patents claim in their Abstracts that the Highly Survivable Urban Utility Vehicle (HSUUV) provides "a novel way to balance the concerns of armor, mobility and cost." In both patents '008 and '648, the invention is summarized:

> The object of the Highly Survivable Urban Utility Vehicle (HSUUV) is to provide soldiers with a vehicle that is effective at protecting them from IEDs [Improvised Explosive Devices], explosive munitions and armor piercing rounds. One major advantage of the HSUUV is the speed and mobility of the vehicle.

'008, 1:41-46; '648, 1:58-63. The intended purpose of the invention is to protect soldiers against various kinds of explosives while preserving the mobility of the vehicle. Therefore, the common sense approach of *Scott v. Finney* leads the Court to the conclusion that the armored vehicle must be tested to see that it in fact protects soldiers as promised and that the vehicle is maneuverable. Indeed, how could it be determined that it works for this purpose unless it is subjected to tests that replicate field conditions?[7] Therefore, the mere assembly of the armored vehicle does not fulfill the requirement that the invention be determined to work for its intended purpose with the result that there is no actual reduction to practice by this act.

### D. Conclusion

In sum, in order to prove actual reduction to practice, the Court finds that the assembly of the armored vehicle as described in the patents is necessary to fulfill the requirement of a physical embodiment and that actual testing of the armored vehicle is necessary to determine whether it works for its intended purpose. The submissions of the parties incline the Court to the conclusion that the armored vehicle described in the patents was not constructed until after the last effective date of the CRADA. The Court is also inclined to conclude that the armored vehicle was not determined to work for its intended purpose until the test conducted in March 2007. Thus, it appears that the first actual reduction to practice of the invention took place under the CRADA.

Unfortunately, the Court further concludes that there are number of loose ends in the submissions that raise genuine issues of material fact that prevent the Court from acting on its inclinations. In particular, Plaintiffs assert that "a fully operational, painted, tested, and delivered BULL was shown no later than February 22, 2007." Although this is two days later than the stipulated date of the effective date of the CRADA (February 20, 2007), the statement leaves the door open to an earlier date. Mr. Kocher, the inventor, declared that the BULL was fully

---

[7] Note that the Court is not requiring that the invention be tested in the field. The construction of a prototype that meets the limitations of the patents which is tested under simulated field conditions is enough.

assembled before February 10, 2007. Plaintiffs claim that they need discovery to find and prove additional pictures. They also need discovery from Ceradyne. (To repeat: The Court wonders why the Plaintiffs, who designed and built the vehicle, would not have proof ready at hand of the invention's first actual reduction to practice.)

Similarly, the Court is confronted with Plaintiffs' assertion that, not only was the armored vehicle completely assembled prior to the effective date of the CRADA, but also, that it was tested before this time. The Court believes that this assertion is based on the armor tests in March 2006 and/or on the mere assembly of the armored vehicle (assuming that this was accomplished before the effective date of the CRADA). Surely, if there were an actual test of the invention's workability, the Plaintiffs would proffer such evidence. But the Court is not certain.

Therefore, the Court must deny Defendants' Motion for Summary Judgment. The Court needs all of Plaintiffs' evidence that proves that an armored vehicle as described in the patent was constructed and successfully tested before February 20, 2007.

The factual dispute that the Court has identified, however, does not mean that the Court cannot rule on the other issues that are presented, namely: (1) the scope of the CRADA, (2) the application of the Bayh-Dole Act, (3) the application of the *Christian* Doctrine and FAR § 52.227-11, and (3) the burden of proof. The Court holds that, if first actual reduction to practice occurred under the CRADA, then it was within the scope of the CRADA. The Court further holds that, if first actual reduction to practice occurred before the effective date of the CRADA, the Bayh-Dole Act and the combination of the *Christian* Doctrine and FAR § 52.227-11 do not apply to give the Government a license to practice the invention. Finally, the Court holds that, because of Plaintiffs' admission that the invention was actually reduced to practice in March 2007 under the CRADA, the burden shifts to Plaintiffs to prove that the first actual reduction to practice occurred before the effective date of the CRADA.

## II.     The Scope of the CRADA

If the invention was first actually reduced to practice under the CRADA, in order for it to be a "Subject Invention," it must have been made "in the performance of Cooperative Work." Article 1.24. Article 1.5 defines "Cooperative Work" as "research, development, engineering, or other tasks performed under this Agreement by ARL or I3 working individually or together, pursuant to the Objectives (Article 2) and the Statement of Work (Appendix A)." Defs.' Mot., DA at 123. As stated above, basically, ARL was supposed to provide the armor and I3 was supposed to integrate it onto a vehicle. Even if, as Plaintiffs argue, I3 worked individually to integrate the armor onto a vehicle without the assistance of ARL, "working individually" still falls within the scope of "Cooperative Work," as Defendants point out. Defs.' Reply at 10. There are also provisions necessitating cooperation: "Ideal Innovations Inc. and ARL will mutually develop design constraints and choose the best available armor technology based on ARL data." ECF No. 72 at DA144. "Ideal Innovations Inc. and ARL will work together to overcome armor integration issues if and when they arise." *Id*. Presumably, ARL and I3 did this in the process of producing and testing the armored vehicle. There is no dispute that the work performed by ARL and I3 (even if performed individually) falls under "research, development, engineering, or

other tasks performed under this Agreement." ECF No. 81 at 10.  Thus, if the first actual reduction to practice took place under the CRADA, it was within the scope of that agreement.

### III.   Bayh-Dole Act

Even if the invention is proved to have been actually reduced to practice before the effective date of the CRADA, Defendants argue that the Bayh-Dole Act, 35 U.S.C. §§ 200-212, gives the Government a license to make and use it by virtue of the REF Contract, despite the fact that that agreement does not have a contractual provision regarding a license.  ECF No. 72 at 25.  The Bayh-Dole Act is aimed a federal "funding agreements."  In such agreements, the federal contractor is allowed to retain ownership of inventions developed under the agreement while the Government receives a license to use the invention.  An invention developed under a federal funding agreement is one that was conceived or first actually reduced to practice during the performance of the agreement.  Defendants argue that the REF qualifies as a funding agreement under the Act; therefore, if the armored vehicle was first actually reduced to practice during the REF Contract, then the Government has a license.

The problem is that the Bayh-Dole Act and the regulations implementing the Bayh-Dole Act require that certain "standard patent rights clauses" be included in Government funding agreements.  37 CFR 401.3(a).  There are no such clauses in the REF contract.  This may be because ARL did not regard the contract as being a Bayh-Dole funding agreement.  In any event, even if it was a Bayh-Dole funding agreement (as Defendants argue), it did not have the required standard patents rights clauses.

### IV.   The *Christian* Doctrine and FAR § 52.227-11

The REF Contract does not have the Bayh-Dole standard patent rights clauses nor does it have the mandatory FAR provisions regarding patent rights, which implements the Act. § 52.227-11.  Nevertheless, Defendants would have the Court read them into the contract under the *Christian* doctrine.  As Defendants state: "Under the *Christian* doctrine, mandatory contract clauses that express a significant or deeply ingrained strand of public procurement policy must be incorporated into the contract by operation of law." ECF No. 72 at 25.  But, as Plaintiffs point out: "The *Christian* doctrine is an exception to the general rule that the Government must put vendors on notice of contract requirements, whether expressly or through incorporation by reference and an exception to standard commercial contracting practices and contract interpretation principles." ECF No. 77 at 24.

The Bayh-Dole Act applies to funding agreement. It defines "funding agreement" to include "any contract, grant, or cooperative agreement entered into between any Federal agency . . . and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government."  Neither the Bayh-Dole Act not the FAR defines "experimental, developmental, or research work."

As the Court observed above, the REF Contract may have lacked the mandatory provisions simply because ARL did not see it as a funding agreement.  Although Plaintiffs may be going a little far (no pun intended) in characterizing the contract as a "purchase order," in

essence, the contract is a firm, fixed price contract for the delivery of two vehicles. The contract is labelled, "SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS." The contract is *for* the Ballistic Protection *Experiment* Project but the Statement of Work indicates that I3's role is to provide two vehicles for the project not to collaborate with REF in the BPE. On the one hand, "[t]he contractor will provide the technical and manufacturing capability to furnish the US Army Rapid Equipping Force (REF) with (2) two prototype armored vehicles based on a commercial domestic truck chassis"; on the other, "[t]hese vehicles will be used in a Ballistic Protection Experiment (BPE) to evaluate the capability of providing protection to mounted soldiers from Improvised Explosive Devices (IEDs)." ECF No. 72 at DA 227.

The Statement of Work (SOW) states that there are three phases to the BPE. In Phase 1, the armor recipe is developed;[8] in Phase 2, the chassis are designed and manufactured; in Phase 3, the armored vehicles are tested. The date of the REF Contract is August 28, 2006. REF provided the final armor design on October 13, 2006. The BULL was likely delivered on February 26, 2007, and it was tested in March 2007. Defendants state that the date of the initial draft of the CRADA is July 20, 2006. The SOW for the potential CRADA was agreed upon on August 18-19, 2006. An updated draft of the CRADA was provided on October 18, 2006. On December 21, 2006 Mr. Kocher signed the CRADA on behalf of I3. Thus, the possibility of a CRADA was known to those involved in the BPE at the time of the REF Contract; yet, the REF contract is not a CRADA. By the time that the CRADA was signed by Mr. Kocher, Phase 1 had occurred, Phase 2 was provided for. This leads the Court to the conclusion that REF made the conscious choice to enter into a CRADA for Phase 3. From the above, the Court draws the conclusion that REF was well-aware of the difference between a CRADA and did not see the commercial item contract of August 28, 2006 as one for experimental, developmental, or research work.

Furthermore, the usual rule is for the Court to presume that the Government did what it was required to do, namely, properly judged the REF contract as one for the procurement of chassis (or armored vehicles). Therefore, Defendants in this case have the burden of proving that in the August 28, 2006 agreement, REF made a grave mistake that deprived the Government of rights in an invention that it developed together with I3. For the reasons stated above, the Court is not persuaded. Indeed, the Court understands the frustration expressed by Plaintiffs:

> Incredibly, Defendants see the complete absence of required contract clauses as evidence that some "lesser official" sought to "avoid or evade" the policies expressed in the Bayh-Dole Act and its equivalent in FAR. The simpler, and correct, explanation—and by far the more reasonable inference from the facts of record—is that the BPE purchase order is not a funding agreement.

ECF No. 77 at 24.

Therefore, the Court holds that the patent rights clauses of Bay-Dole and the FAR are not incorporated by law into the REF Contract by the *Christian* doctrine, with the result that, if the

---

[8] The fact that I3 was to have a role in the selection of the armor does not transform a contract for a commercial item into one for experimental, developmental, or research work.

invention was first actually reduced to practice during this contract, the Government does not have a license.

V.     **Burden of Proof**

In their complaint, Plaintiffs admit that in March 2007 there was an actual reduction to practice of the invention:

> From March 5-19, 2007, I-3 prototype vehicles were tested at the Aberdeen Proving Ground. To the Government's astonishment, the prototype vehicles exhibited unmatched superior armor characteristics: EFPs could not penetrate the sides of the vehicles, and the armor system was light enough such that the vehicles maintained a high degree of mobility.

ECF No. 1 at 7, ¶ 25.

But, as Plaintiffs note, this is not an admission of *first* actual reduction to practice of the invention. This admission, however, is enough—as Defendants argue—to shift the burden of proof.

Proving that there is a license to use an invention is an affirmative defense to a case of patent infringement under 1498: "The defendant bears the burden of proof on the license defense and must establish by a preponderance of the evidence that a conception or a first actual reduction to practice occurred in the performance of a Government contract." *Tech. Dev. Corp. v. United States*, 597 F.2d 733, 746 (Ct. Cl. 1979). However,

> If the defendant proves that the invention was reduced to practice in the performance of such a Government contract, then the burden shifts to the plaintiff to prove that a first reduction to practice of the invention occurred prior to the award of the contract. The proof of conception and/or reduction to practice is a heavy one for either party and requires more than self-serving testimony or uncorroborated records and documents. If the defendant succeeds in proving by a preponderance of the evidence that conception has occurred in the performance of a Government contract, then the Government is entitled to a license.

*Id*. at 747.

The admission of Plaintiffs to the actual reduction to practice in March 2007 is tantamount to Defendants proving that an actual reduction to practice occurred at that time. Therefore, Plaintiffs have the burden of going forward and of proving that the first actual reduction to practice occurred before the effective date of the CRADA.

### IV. Disposition of Defendants' Motion for Summary Judgment

Because the Court finds that there are genuine disputes of material fact, the Court **DENIES** Defendants' Motion for Summary Judgement and **ORDERS** a mini-trial to determine the date of the first actual reduction to practice of the invention described in the '008 and '648 patents. At this mini-trial, Plaintiffs have the burden of going forward and of proof by a preponderance of the evidence that the first actual reduction to practice of the invention took place before the effective date of the CRADA. The Court will only admit evidence that is relevant to proving that the first actual reduction to practice took place before the effective date of the CRADA.

While the Court cannot determine the first actual reduction to practice, the Court has found that:

1. The invention consists of a configuration of armor on a vehicle, as described in the '008 and '648 patents.
2. An actual reduction to practice of the invention occurred under the CRADA.
3. The March 2006 test was a test of armor, not of the invention.
4. An actual test is necessary to prove that the prototype of the armored vehicle works for its intended purpose.
5. If the invention was first actually reduced to practice before the effective date of the CRADA, the Bayh-Dole Act and the pertinent FAR provisions are not incorporated by law through the *Christian* doctrine to grant the Government a license.
6. Plaintiffs, having admitted that an actual reduction to practice occurred under the CRADA, now bear the burden of proof and of going forward.

These findings form the basis for the mini-trial and, at the trial, may not be disputed. The Court has filed this opinion and order under seal. The parties, therefore, shall file any redactions, if any, within 7 days from the date of this Opinion and Order.

The Court further SCHEDULES a telephonic status conference to be held on May 28, 2020, at 11:00 a.m. to discuss trial dates. An order will be forthcoming with regard to the procedures for the telephonic status conference.

**IT IS SO ORDERED.**

s/Edward J. Damich  
EDWARD J. DAMICH  
Senior Judge